UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

PURCHASE PARTNERS, LLC,

                Plaintiff,

      -v-

CARVER FEDERAL SAVINGS BANK,

                Defendant,

and

MARINER'S  BANK and PAUL SCHMIDT, SR.,

            Third Party Defendants.

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:
DATE FILED: 12/13/12

09 Civ. 9687 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

      The present case involves a dispute between two banks over losses arising from a mortgage loan to a borrower who subsequently defaulted.  In March 2007, Defendant Carver Federal Savings Bank ("Carver," the "Lender," or the "Defendant") — a New York Bank — made a loan totaling $6,080,000 to Shaker Gardens, Inc. ("Shaker" or the "Borrower"), a New York corporation wholly owned by Yehuda Nelkenbaum, to finance the purchase of real property in Monticello, New York, containing approximately 170 residential apartments.  The same day, Carver and Third-Party Defendant Mariner's Bank ("Mariner's Bank," the "Participant," or "Third-Party Defendant") — a New Jersey State chartered commercial bank — entered into a Participation Agreement (the "Participation Agreement" or the "Agreement"), pursuant to which Mariner's Bank paid $3,040,000 to Carver in exchange for a fifty percent interest in the loan.  The parties dispute whether Shaker made any payments on the loan.  There

is no dispute, however, that Shaker defaulted on the loan in or before June 2008.  In December 2010, Carver foreclosed on the property securing the loan.

On November 20, 2009, Mariner's Bank brought this action against Carver.  In its Complaint, Mariner's Bank alleges (1) various breaches of the Participation Agreement; (2) breach of the covenant of good faith and fair dealing; (3) gross negligence; and (4) fraud.  It seeks money damages, specific performance, and attorneys' fees.  Just over one month after the filing of the Complaint, Mariner's Bank entered into an agreement to transfer its right, title, and interest in and to its claims in this case to Purchase Partners, LLC ("Purchase Partners" or "Plaintiff"), a New Jersey limited liability company; in the wake of that transfer, the Honorable Richard J. Howell (to whom the case was previously assigned) issued an order substituting Purchase Partners as Plaintiff and re-designating Mariner's Bank as Third-Party Defendant. (Docket No. 45).  Meanwhile, Carver filed its Answer on January 6, 2010, asserting counterclaims against Mariner's Bank, Purchase Partners, and Paul Schmidt, Sr. (an individual member of Purchase Partners).  At bottom, Carver alleges that Mariner's Bank breached the Participation Agreement by failing to reimburse Carver for advances Carver made on behalf of Shaker (Counterclaim 1) and by transferring its interest in the loan to Purchase Partners (Counterclaim 2).  Carver seeks declaratory (Counterclaims 3, 6, 8) and injunctive (Counterclaims 4, 7) relief, monetary damages (Counterclaims 1, 2), and an award of attorneys' fees (Counterclaims 5, 9).

Now pending before the Court are the parties' cross-motions for summary judgment. (Docket Nos. 63, 84).  In addition, on September 7, 2012, following oral argument on the motions, Purchase Partners filed a motion for leave to amend the Complaint (superseding an earlier motion for leave to file an amended complaint) seeking to add claims for negligent

misrepresentation and gross negligent representation and to revise its pleadings with respect to the contract and fraud claims in light of discovery.  (Docket No. 127).  For the reasons discussed below, the parties' respective motions for summary judgment are GRANTED in part and DENIED in part.  Purchase Partners's motion for leave to amend the Complaint is also GRANTED in part and DENIED in part.  The net result of these rulings is that all of Purchase Partners's claims, except for its breach of contract claim and its claim for attorneys' fees, are dismissed.  All claims against Schmidt are also dismissed.  As for the counterclaims, Carver is granted summary judgment as to liability on its counterclaim regarding transfer of Mariner's Bank's interest in the Participation Agreement to Purchase Partners, but damages are to be determined at trial; the Court dismisses the counterclaims seeking declaratory and injunctive relief in connection with the transfer.  The rest of Carver's counterclaims survive.  Finally, as discussed in more detail below, Purchase Partners may amend its Complaint to flesh out its breach of contract claim, but its motion for leave to file an amended complaint is otherwise denied.

## BACKGROUND

### A.  The Loan and the Participation Agreement

As noted, this case involves a $6,080,000 loan from Carver to Shaker to finance the purchase of real property in Monticello, New York, containing approximately 170 residential apartments.  (Def.'s Resp. to Pl.'s 56.1 Statement ("Def.'s 56.1 Resp.") Nos. 2-3 (Docket No. 90)).  Given the size of the loan, Carver approached other banks, including Mariner's Bank, to contribute to the loan pursuant to a participation agreement.  (*Id.* No. 4).  On March 1, 2007, the date the loan closed, Carver and Mariner's Bank entered into the Participation Agreement for that purpose.  (*Id.* No. 5; Answer Ex. A ("Agreement") (Docket No. 4)).  Pursuant to the

Agreement, Mariner's Bank paid $3,040,000 to Carver and obtained a fifty percent interest in the loan.  (Def.'s 56.1 Resp. No. 5).  Carver was responsible for servicing the loan (Agreement § 3.1),  although the Participation Agreement gave it the option of delegating that task to a third party at its discretion and without providing notice to Mariner's Bank (*Id.* §§ 7.12, 7.15), which it eventually did.  (*See* Def.'s 56.1 Resp. Nos. 13-14).

The loan was evidenced by a promissory note (the "Note") and secured by a mortgage agreement (the "Mortgage").  (Def.'s 56.1 Resp. No. 6).  The Mortgage granted Carver a lien against the property and a collateral assignment of rent, giving Carver the right to collect and apply the rent generated by the property.  (*Id.*).  Shaker's repayment obligation under the Note was personally guaranteed by Nelkenbaum (*id.*), who was no stranger to Carver.  In 2006, Carver had made three other loans, totaling approximately $2.5 million, to entities owned or controlled by Nelkenbaum.  (*See id.* No. 2)

In conjunction with the loan, Shaker also entered into an Escrow and Security Agreement with Carver that required Shaker to establish an escrow account to ensure that certain repairs were made to the property.  (Pl.'s Am. Resp. to Def.'s Rule 56.1 Statement ("Pl.'s 56.1 Resp.") Nos. 5-8 (Docket No. 101)).  If Shaker made the repairs, the money was to be returned to it. (*Id.*).  In the event of a default, Carver, at its sole discretion, could apply the escrow funds to the payment or to a reduction in whole or in part of the loan.  (*Id.* No. 9).

## B.  Carver's Advances and Shaker's Default on the Loan

Shaker issued its first payment under the Note on April 1, 2007, but Carver never received the money because Shaker stopped payment on the check.  (Pincus Aff. Ex. 20 (Docket No. 111); Tr. of Aug. 28, 2012 Oral Arg. ("Transcript") 43:24-25.  The second check, issued on May 1, 2007, was returned due to insufficient funds.  (Pincus Aff. Ex. 22).  Purchase Partners

maintains that there is no record at all of the third payment that should have been made on June 1, 2007.  (Pl.'s 56.1 Statement No. 12 (Docket No. 81)).

For reasons that are not altogether clear, however, Carver did not immediately realize that Shaker had failed to make at least two of these payments in a timely fashion.  (*See id.*; Transcript 43:24-25 (explaining that there is "[n]o doubt" about the fact that Carver "overlooked" the first two payments)).  Additionally, Mariner's Bank did not immediately know about the missed payments because it still received its share of the money from Carver.  (*See* Pl.'s 56.1 Resp. No. 83).  According to Purchase Partners, that is because Carver made the loan payments on Shaker's behalf using money from the repair escrow — ultimately transferring the money to its loan servicer, Dovenmuehle Mortgage, Inc. ("DMI"), in Illinois.  It alleges that DMI then applied the payments to the loan and re-delivered the funds back to Carver and that Carver, in turn, distributed fifty percent of the money to Mariner's Bank on account of its participation interest. (Pl.'s Mem. Law 8-9 (Docket No. 82).

Although Carver disputes some details of Purchase Partners's explanation, (*see* Def.'s 56.1 Response No. 12),[1] it nonetheless maintains that it was authorized to make payments on behalf of Shaker pursuant to Section 3.8(a) of the Participation Agreement, which provides that Carver may make any "advance[s] which [are] reasonably incurred in order to protect the rights of the Holders, including, without limitation, all expenses reasonably incurred by the Lender to enforce the Loan Documents."  (Agreement § 3.8(a)).  Over the course of the loan, Carver made advances on behalf of Shaker both to cover Shaker's missed payments and to cover taxes,

---

[1]     It is not clear whether Carver disputes Purchase Partners's representation of DMI's role, the means through which Carver made the initial loan payments on behalf of Shaker, or both. But Carver does admit that it discovered that the checks were missing "long after Carver transferred the initial three payments to DMI" (Def.'s 56.1 Response No. 12), and that Mariner's Bank had received its share of those payments (Pl.'s 56.1 Resp. No. 83).

insurance, legal fees, and repairs to the property.  (Def.'s Mem. Law 3 & n.2 (Docket No. 70)).

The precise total of these advances is somewhat disputed: Carver maintains that it advanced

$1,789,832.47, while Mariner's Bank and Purchase Partners claim they are only aware of

advances totaling $798,076.68.  (Pl.'s 56.1 Resp. No. 23).  In any event, rather than apply these

sums to the principal of Shaker's underlying obligation, Carver treated the advances as a

"negative escrow," which is a receivable due and owing by the borrower secured by the real

property.  (*Id.* No. 24).

Shaker officially defaulted on the loan in early to mid-2008 — roughly a year after the

initial payments were returned.  (Transcript 45:4-12).  The parties dispute to what extent Shaker

made payments in the intervening months.  Purchase Partners alleges that there is evidence

showing that Shaker did not in fact make *any* payments on the loan.  Although Carver submitted

copies of checks purporting to demonstrate that at least ten payments were made (March 19,

2012 Donohue Decl. "Donohue Decl. 1" Ex. S (Docket No. 64)), Purchase Partners maintains

that it is uncertain whether those payments were applied to the loan in question or to one of the

other Nelkenbaum loans.  (Transcript 48:18-51:14).  In any event, approximately six months

later, in November 2008, Carver discovered that it had never even received the initial payments.

Upon that discovery, for accounting purposes, DMI reversed all payments made during the

course of the loan and reapplied all but the last two payments in order to account for the returned

checks.  (Def.'s 56.1 Resp. No. 12).

In December 2008, Carver notified Mariner's Bank that the first two payments had

"bounced" and asked Mariner's Bank to refund its share of those payments.  Mariner's Bank

agreed.  (Pl.'s 56.1 Resp. No. 83).

**C. Carver's Civil Action and Foreclosure on the Property**

On May 14, 2008, Carver sent a letter to Shaker (and Nelkenbaum), via counsel,

indicating that because Shaker had failed to make monthly payments since April 1, 2008, Carver

was accelerating the entire balance of the loan. (Pincus Aff. Ex. 30). The letter further informed

Shaker that Carver intended to commence an action against it, and advised Shaker to retain an

attorney. (*Id.*). Less than a month later, on June 2, 2008, Carver did commence a civil action

against Shaker and Nelkenbaum in New York Supreme Court to collect under the Note and

Guaranty. (Pincus Aff. Ex. 31, at 2-3). In an e-mail dated June 4, 2008, Frank Greco, Mariner's

Bank's Senior Vice President, advised Frank Giancola, Mariner's Bank's current President and

CEO, that he had been informed that Carver was bringing an action against Nelkenbaum

personally and that Carver would let him know when Nelkenbaum was served. (April 19, 2012

Donohue Decl. ("Donohue Decl. 2") Ex. Q (Docket No. 88)).

Thereafter, Nelkenbaum was served. In the state court proceedings that followed, Shaker

and Nelkenbaum argued that the May 14, 2008 notice from Carver was defective because it was

sent by Carver's attorneys rather than, as provided by the Mortgage, a named law firm or Carver

itself. (*See* Pincus Aff. Ex. 31, at 6). On January 7, 2009, in an attempt to cure this deficiency,

Carver sent a second letter to Shaker and Nelkenbaum alerting them that Shaker had failed to

make monthly payments due under the loan. (Pincus Aff. Ex. 35). This time, Carver sent the

letter itself rather than delegating that task to its attorneys. (*Id.*). The content of the letter,

however, was substantially the same. (*Compare id.* Ex. 30, *with id.* Ex. 35).

While the civil action against Shaker and Nelkenbaum was still pending, Carver decided

to change tacks and pursue a foreclosure action. Thus, on January 27, 2009, Carver commenced

a foreclosure action in New York Supreme Court. (*See id.* Ex. 32, at 3). Because New York law

requires a mortgagee to "elect between pursuing a legal remedy or foreclosing on the property," *Mfrs. Hanover Trust Co. v. 400 Garden City Assoc.*, 568 N.Y.S.2d 505, 507 (Sup. Ct. 1991), Carver moved shortly thereafter to discontinue the June 2, 2008 civil action (s*ee* Pincus Aff. Ex. 32, at 3).  Carver's motion to discontinue was granted over Shaker's objection.  (*See id.*).

On February 2, 2009, Carver made an ex parte application as part of the foreclosure action to appoint a rent receiver for Shaker Gardens.  (*See id.*)  Thereafter, the parties filed cross-motions for summary judgment.  Shaker's motion relied on the denial of summary judgment in a different case between Carver and Shaker.  (*Id.* at 3-4).  In that case, involving a different property but the same form loan documents and the same acceleration letter as in this case, the Court had determined that Carver had failed to provide Shaker with proper notice of default and an opportunity to cure as required by the Mortgage.  (*See id.* at 4).

On July 8, 2009, the New York Supreme Court granted Shaker's motion, dismissed Carver's Complaint, and denied Carver's cross-motion for summary judgment.  It also denied Carver's application to appoint a rent receiver.  (*Id.* at 7-8).  Relying on its earlier decision in the related action, the Court held that the January 7, 2009 letter from Carver to Shaker was defective because it did not "constitute written notice of default as required" under the Mortgage.  (*Id.* at 7).  Although Carver maintains that the New York Supreme Court's ruling was wrong (Donohue Decl. 2 Ex. A ¶ 34), it chose to commence a new foreclosure action rather than appeal the ruling.  (*Id.* ¶ 41).  In December 2010, Carver finally obtained a Judgment of Foreclosure and Sale and subsequently conducted a foreclosure sale in which it was the high bidder.  (*Id.*; Pincus Aff. Ex. 86; Pl.'s 56.1 Resp. No. 73).

**D.  The Instant Action**

As noted, Mariner's Bank commenced this action on November 20, 2009.  Its Complaint includes six counts: Count One seeks specific performance to compel Carver to apply the amounts it advanced on behalf of Shaker to the principal balance of the loan; Count Two alleges various breaches of the Participation Agreement; Count Three asserts breach of the covenant of good faith and fair dealing; Count Four alleges gross negligence; Count Five asserts a claim for fraud; and Count Six seeks attorneys' fees.  (After the close of discovery, Purchase Partners filed a motion for leave to amend its Complaint to add causes of action for negligent and gross negligent misrepresentation.  (Docket No. 83)).  On December 21, 2009, Mariner's Bank and Purchase Partners entered into an agreement whereby Mariner's Bank agreed to transfer its "right, title, and interest in" this litigation to Purchase Partners  (Donohue Decl. 2 Ex. HH), after which Judge Holwell substituted Purchase Partners as Plaintiff and re-designated Mariner's Bank as Third-Party Defendant (Docket No. 45).  (Mariner's Bank had agreed to transfer its participation interest to Purchase Partners on September 30, 2009 subject to a "put option." (Donohue Decl. 2 Ex. B ¶ 17)).

On January 6, 2010, Carver filed its Answer denying the allegations, asserting five counterclaims against Mariner's Bank, and asserting four third-party claims (also styled "counterclaims") against Purchase Partners and Schmidt: (1) breach of the Participation Agreement by failing to reimburse Carver for fifty percent of the advances (Answer ¶¶ 76-97 (Docket No. 4)); (2) breach of the Participation Agreement by transferring Mariner's Bank's interest therein to Purchase Partners (and Schmidt) without Carver's consent (*id.* ¶¶ 98-103); (3) a declaratory judgment that the transfer by Mariner's Bank of its interest in the Participation Agreement to Purchase Partners is void (*id.* ¶¶ 104-09); (4) an injunction precluding Mariner's

Bank from transferring its interest in the Participation Agreement (*id.* ¶¶ 110-11); (5) a request for attorneys' fees against Mariner's Bank (*id.* ¶¶ 112-14); (6) a declaratory judgment against Purchase Partners and Schmidt that the transfer by Mariner's Bank of its interest in the Participation Agreement to Purchase Partners is void (*id.* ¶¶ 123-29); (7) an injunction precluding Purchase Partners and Schmidt from transferring their interest in the Participation Agreement (*id.* ¶¶ 130-32); (8) a declaratory judgment that Purchase Partners and Schmidt are obligated to reimburse Carver for fifty percent of the advances (*id.* ¶¶ 133-39); and (9) an award of attorneys' fees against Purchase Partners and Schmidt (*id.* ¶¶ 140-42).[2]

On March 19, 2012, Carver moved for summary judgment on the claims asserted against it and on all of its counterclaims.  (Docket No. 63).  On March 21, 2012, Purchase Partners cross-moved for summary judgment on (1) aspects of its breach of contract claim (Count Two); (2) Carver's counterclaims seeking to recover fifty percent of the advances made on behalf of Shaker; and (3) all counterclaims against Schmidt.  (Docket Nos. 80, 84).  In addition, on September 7, 2012, following oral argument on these motions, Purchase Partners filed a motion for leave to amend its Complaint — superseding an earlier such motion — seeking to add claims for negligent misrepresentation and gross negligent representation and to revise its pleadings with respect to the contract and fraud claims in light of discovery.  (Docket No. 127).

In the course of briefing these motions, the parties have each withdrawn certain claims. Specifically, Purchase Partners consents to dismissal of its claims for specific performance (Count One) and breach of the covenant of good faith and fair dealing (Count Three).  (*See* Pl.'s Supplemental Submission 8 (Docket No. 132); Pl.'s Opp'n Mem. (Docket No. 96) at 46).

---

[2]      For ease of reference, the Court will hereafter refer to the counterclaims and the third-party claims as "counterclaims" collectively.

Carver, for its part, consents to dismissal of all its claims against Paul Schmidt.  (Def.'s Opp'n Mem. 1 n.3).

## STANDARD OF REVIEW

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate  "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  An issue of fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Affidavits submitted in support or in opposition to summary judgment

must be based on personal knowledge, must "set forth such facts as would be admissible in

evidence," and must show "that the affiant is competent to testify to the matters stated therein."

*Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

Where, as here, each side moves for summary judgment, "neither side is barred from

asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of

law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he

court must evaluate each party's motion on its own merits, taking care in each instance to draw

all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting

*Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

## DISCUSSION

As noted, Purchase Partners consents to dismissal of Counts One and Three of its

Complaint and Carver consents to dismissal of all claims against Schmidt.  In its motion, Carver

moves for summary judgment on the rest of Purchase Partners's claims and on all of its

counterclaims.  Purchase Partners cross-moves for summary judgment on aspects of its breach of

contract claim (Count Two) and Carver's counterclaims seeking to recover fifty percent of the

advances extended to Shaker.  The Court will first address Purchase Partners's remaining claims,

as well as its motion for leave to amend the Complaint, then turn to Carver's counterclaims.  In

doing so, the Court applies New York law, as all parties agree that New York law governs.  (*See*

Def.'s Mem. Law 15-19; Pl.'s Opp'n Mem. 46-49, 61-63; *see also* Agreement § 7.4 ("In all

respects . . . this Agreement shall be governed by, and construed in accordance with, the

substantive laws . . . of the State of New York . . . .")).[3]

---

[3]      As a threshold matter, Purchase Partners asserts that Carver's motion for summary
judgment should be disregarded because it is founded on "incompetent evidence."  (Pl.'s Opp'n
Mem. 22-29).  This argument is without merit, however, as courts routinely "allow attorneys to

**A.  Purchase Partners's Claim for Breach of Contract (Count Two)**

In Count Two of its Complaint, Purchase Partners alleges that Carver breached

(1) Section 3.5(a)(iii) of the Participation Agreement by failing to give notice and obtain

Mariner's Bank's consent prior to making the advances to Shaker; (2) Section 3.1 of the

Participation Agreement, by failing to add the advances to the loan principal; (3) Section

3.5(a)(vii)[4] of the Participation Agreement by failing to give notice and obtain Mariner's Bank's

consent before instituting a civil action against Shaker; (4) Sections 3.1, 3.2, and 3.6(b) of the

Participation Agreement by issuing a defective and improper notice of default and failing to act

diligently and promptly in obtaining a rent receiver; and (5) Sections 3.2 and 3.6(b) of the

Participation Agreement by failing to detect Shaker's alleged initial payment defaults.[5]  Carver

moves for summary judgment on all of these claims.  By contrast, Purchase Partners moves for

---

submit declarations in support of a motion for summary judgment as a vehicle to introduce evidence produced in discovery into the record in a cohesive manner," *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, No. 11 Civ. 1299 (HB), 2012 WL 1372150, at *2 (S.D.N.Y. Apr. 18, 2012), and "a corporate representative may testify and submit affidavits based on knowledge gained from a review of corporate books and records," *Harrison-Hoge Indus., Inc. v. Panther Martin S.R.L.*, 05-CV-2851 (JFB) (ETB), 2008 WL 905892, at *28 (E.D.N.Y. Mar. 31, 2008). That is precisely what Carver submitted here: the affidavit of an attorney, Antonia M. Donahue, Esq., which was primarily used to introduce evidence produced in discovery; and the affidavit of a corporate representative, Augustus Costaldo, which was based on a review of corporate books and records.

[4]     The Complaint mistakenly refers to Section 3.5(a)(vi), which relates to the settlement of insurance claims.

[5]     Carver contends that Purchase Partners's claim regarding the alleged failure to detect the initial payment defaults is not properly pleaded in the operative Complaint.  (Def.'s Opp'n Mem. 5-7).  Purchase Partners seeks leave to file an Amended Complaint in part to address that arguable deficiency.  (Mem. Law Supp. Mot. To File Am. Compl. 6-15 (Docket No. 129)). Although Purchase Partners could have, and should have, moved to amend the Complaint on this score earlier, Carver has identified no prejudice that would arise from allowing the amendment. Accordingly, the Court grants Purchase Partners leave to amend in this respect and addresses the claim, as amended, in the text below.  The remainder of Purchase Partners's motion for leave to amend is addressed separately below.

summary judgment only on the "liability aspects" of (4) and (5); it contends that trial is warranted on the remaining claims and damages.

### 1.   Carver's Liability Is Not Limited to Bad Faith Breaches

Before turning to the parties' arguments with respect to Purchase Partners's individual claims of breach, it is necessary to address one general argument made by Carver that relates to all of the contract claims: that, under Sections 7.17(g) and 7.18 of the Participation Agreement, Carver's liability is limited to breaches that "rise to the level of bad faith, willful misconduct or gross negligence." (Def.'s Opp'n Mem. 4). To the extent relevant here, Section 7.17(g) provides that Carver "makes no representation and shall have no responsibility with respect to . . . the filing, recording, or taking of any other action with respect to any of the Loan Documents, except in the case of the willful misconduct or gross negligence of the Lender." (Agreement, § 7.17(g)). Section 7.18 provides, in relevant part, that Carver shall not be held liable for any act or omission "by any person on behalf of the Lender" unless that person "was authorized by the Lender to act in bad faith, or with willful misconduct or gross negligence." (*Id.* § 7.18). Carver contends that the phrase "taking of any other action" in Section 7.17(g) should be read to include any and all actions having to do with the loan documents, including those actions Purchase Partners complains of in Count Two of the Complaint, and that Section 7.18 limits liability under the Agreement to acts taken "in bad faith, or with willful misconduct or gross negligence." (Transcript 38:13-39:16).

This argument is unpersuasive. First, the Court agrees with Purchase Partners that, in context, the phrase "taking of any other action" in Section 7.17(g) refers only to actions similar in kind to the filing or recording of loan documents. (Transcript 52:4-53:1). That interpretation is consistent with the principle of *ejusdem generis*, which holds that "when a general word or

phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."  Black's Law Dictionary 594 (9th ed. 2009); *see Rockland Exposition, Inc. v. Great Am. Assurance Co.*, 746 F. Supp. 2d 528, 537 n.8 (S.D.N.Y. 2010) (noting that "[i]t is not uncommon for courts interpreting contracts to rely on the same principles that guide statutory construction" (citing *Tilley v. Mead Corp.*, 927 F.2d 756, 771 (4th Cir. 1991), *aff'd*, 445 F. App'x 387 (2d Cir. 2011) (Summary Order))).  That interpretation is also necessary to reconcile Section 7.17(g) — a provision buried at the end of the Participation Agreement under the heading "No Reliance on Lender" — with Section 3.1, in which Carver agreed "to exercise the same degree of care to protect the Interest of Participant as Lender uses to protect its own investments and interests."  (Agreement §§ 7.17, 3.1; *see also* Transcript 59:15-19).

Carver's reliance on Section 7.18 of the Participation Agreement is even more misplaced.  As Carver all but conceded at oral argument (*see* Transcript 39:3-4; 39:20-22), that provision does limit Carver's liability, but — as its title, "Limitation on Liability Of Lender For Acts By Other Persons," and its plain language make clear — only for acts or omissions of third parties.  Because Purchase Partners's breach of contract claim does not involve the acts or omissions of third parties, let alone third-party negligence or third-party misconduct, Section 7.18 is inapposite.[6]

---

[6]  Carver makes one other argument in reference to Purchase Partners's contract claims generally: that summary judgment should be granted because Purchase Partners has failed to show non-speculative damages arising from the alleged breaches.  (Def.'s Mem. Law 14-15).  As the discussion below makes clear, however, Purchase Partners has adequately proved that, if Carver breached the Participation Agreement, it suffered some pecuniary damage.  The precise measure of such damages can be determined at trial.  *See, e.g.*, *Tenor Opportunity Master Fund, Ltd. v. Oxygen Biotherapeutics, Inc.*, No. 11 Civ. 06067 (KBF), 2012 WL 2849384, at *5 (S.D.N.Y. July 11, 2012) ("So long as it is clear that the plaintiff has sustained some damages . . . summary judgment may be granted . . . with a damages determination to await trial." (citing

### 2.   Specific Alleged Breaches of the Participation Agreement

#### a.   Notice and Treatment of the Advances

The Court turns, then, to Purchase Partners's specific allegations of breach and the parties' arguments for and against summary judgment.  Purchase Partners argues first that, under the terms of the Participation Agreement and the Mortgage, Carver was required to add the amount of the advances it made to the underlying principal of Shaker's loan.  Treating the advances as a "negative escrow," it alleges, was a breach of that requirement.  (Pl.'s Opp'n Mem. 31-32).  Purchase Partners argues, further, that because the advances constitute "no less than an additional extension of credit to a borrower that is already in default" (Pl.'s Opp'n Mem. 35), they should have triggered the written consent provision of the Participation Agreement. (*See* Agreement § 3.5[a](iii)).  Because Carver never notified Mariner's Bank of its intention to make the advances, and, consequently, Mariner's Bank never gave Carver written consent to increase the amount of the loan, Purchase Partners argues that Carver breached the Participation Agreement.

Carver moves for summary judgment on the ground that Section 3.8(a) of the Participation Agreement authorized it to pay advances in its "commercially reasonable discretion" and that the relevant notice and consent provisions in the Participation Agreement and the Mortgage were not triggered by its making advances.  Regardless of its contractual obligations to obtain written consent, Carver argues that Purchase Partners suffered no damages as a result of the way in which Carver accounted for the advances.  (Def.'s Reply Mem. Law

---

*U.S. Bank Nat'l Ass'n v. SW Airlines Co.*, No. 07 Civ. 11131 (DLC), 2009 WL 2163594, at *12 (S.D.N.Y. July 20, 2009))).

Supp. Summ. J. ("Def.'s Reply Mem.") 10 (Docket No. 114 Attach. 11)).  Finally, Carver argues

that sufficient notice of the advances was in fact provided to Mariner's Bank and, because

Mariner's Bank did not object to the advances, Purchase Partners should be estopped from

alleging a breach on that basis now.  (*Id.* at 8-9).

Carver has not carried its burden on this issue.  First, Section 3.8(a) of the Participation

Agreement notwithstanding, the Mortgage — which is incorporated by reference into the

Participation Agreement (Pl.'s Opp'n Mem. 31; Def.'s Reply Mem. 7; Agreement §§ 1.1, 3.1) —

required that charges paid by the Mortgagee (Carver) on behalf of the Mortgagor (Shaker) be

"added to the indebtedness secured hereby and be secured by this Mortgage . . . ."  (Mortgage

§ 5(a) (Docket No. 64, Ex. B)).  On the basis of the current record, the Court cannot determine if

"added to the indebtedness" means added to the principal (as Purchase Partners contends) or

merely added to the amount owed by Shaker (as Carver contends).  For substantially the same

reasons, the Court cannot determine to what extent, if any, the written consent requirement was

triggered by the advances.  Thus, summary judgment is improper.  *See, e.g.*, *Postlewaite v.*

*McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (explaining that "when the meaning of the

contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact

is presented which cannot be resolved on a motion for summary judgment" (citation and internal

quotation marks omitted)).  As for Carver's argument about damages, there is a dispute about

whether Carver recovered interest on the negative escrow amount in the foreclosure action as it

did for the principal of the loan.  (*Compare* Def.'s Supplemental Submission at 6 (Docket No.

125), *with* Pl.'s Supplemental Submission at 9; *see* Seidman Decl. Exs. 85, 86 (Docket No.

131)).  At this stage, a reasonable jury could decide that it did not, in which case Purchase

Partners would have a valid claim to the amount of lost interest.

**b.**     **Notice and Action Taken Regarding Civil Action**

Next, Purchase Partners alleges that Carver breached the Participation Agreement by failing to obtain Mariner's Bank's written consent before commencing legal action against Shaker.  Purchase Partners relies on Section 3.5(a) of the Participation Agreement, which states that "the Lender shall not, *without the Participant's prior written consent*, exercise any such rights or take or omit to take any action which would . . . (vii) except as set forth in Section 3.6 of this Agreement, commence any legal action against any Obligor or against any Security, except in emergency situations to preserve the Security or any right against any Obligor." (Agreement § 3.5(a) (emphasis added); *see also* Compl. ¶36 (relying on Section 3.5(a)(vii))). Carver moves for summary judgment on the ground that it gave Mariner's Bank adequate notice of the civil action and that, even if it did not, Purchase Partners's claim is barred by waiver or estoppel because Mariner's Bank never objected to Carver's course of action once Mariner's Bank learned of it.  (Def.'s Reply Mem. 10-12).

Carver is entitled to summary judgment on this aspect of Purchase Partners's contract claim, albeit not for the reasons it initially put forward.  Although both parties initially briefed this claim on the theory that Section 3.5(a) was the operative section of the Participation Agreement, the relevant portion of that provision states that written consent is required "*except as set forth in section 3.6 of this agreement*."  Section 3.6, in turn, provides that:

> [u]pon the occurrence of a default under any of the Loan Documents evidencing or securing the Loan which would permit acceleration of the maturity of the Loan[,] . . . *the Lender . . . shall promptly and diligently (but in consultation with Participant) prosecute its remedies under the Loan Documents in good faith and in accordance with the standard of care set in Section 3.1 above* (including, without limitation, taking all action, in a reasonably prudent manner, which is reasonably calculated to foreclose each lien and enforce each security interest against the Security).

(Agreement § 3.6 (emphasis added)).  On its face, this section does not appear to have required Carver to obtain Mariner's Bank's consent before prosecuting its remedies upon the occurrence of Shaker's default; it appears to have required only that Carver act "in consultation with" Mariner's Bank.

The Court sees no merit in Purchase Partners's contention (made in response to the Court's questions regarding the applicability of Section 3.6 at oral argument) that Carver was required to obtain Mariner's Bank's written consent pursuant to Section 3.5 of the Participation Agreement *and*, after initiating legal proceedings, to consult further with Mariner's Bank pursuant to Section 3.6.  (*See* Pl.'s Supplemental Submission 12-14).  That interpretation ignores the plain language of Section 3.5, which states that written consent is required "*except* as set forth in section 3.6."  (Agreement § 3.5(a)(vii) (emphasis added)).  Nor is the Court persuaded by Purchase Partners's contention that this interpretation of Section 3.6 would "swallow the entire meaning of § 3.5[a]."  (*Id.* at 12).  Section 3.6 authorized Carver to prosecute its legal remedies without obtaining Mariner's Bank's consent in the event of a default, presumably to facilitate a quick response in such circumstances.  Section 3.5 required written consent before legal action was taken in other circumstances.  The two provisions are thus easily reconciled.

On the present record, no reasonable jury could find that Carver breached the requirements of Section 3.6.  First, the record is clear that Carver pursued its legal remedies "in consultation with" Mariner's Bank.  As noted above, in an e-mail dated June 4, 2008, for example, Mariner's Bank's Senior Vice President advised another Mariner's Bank executive that "Carver is going after [Nelkenbaum] personally and is suing him on his guaranty.  They were supposed to serve him yesterday . . . . They will let me know when and if this was done."  (Donohue Decl. 1 Ex. M).  On July 10, 2008, Carver informed the Senior Vice President via e-

mail that it was "pursing [sic] legal action against the Borrower," and encouraged him to contact Carver if Mariner's Bank needed any additional information.  (*Id.* Ex. N).  Finally, Carver's Executive Vice President, Charles Koehler, testified in his deposition that he had "more than one conversation" with Don Estes, Mariner's Bank's Vice President, about their potential remedies and "the way I was going to . . . go forward with the litigation."  (*Id.* Ex. P 47:1-48:21).  Koehler testified that he "was very specific" about his legal strategy and that Mariner's Bank agreed with it.  (*Id.* at 48:3-9; *see also id.* Ex. R (showing Mariner's Bank's awareness of the suit)).

Second, although Purchase Partners has reason now to second guess Carver's decision, there is no basis for a jury to find that Carver failed to "promptly and diligently . . . prosecute its remedies under the Loan Documents in good faith and in accordance with the standard of care set in Section 3.1" by filing a civil case instead of seeking foreclosure in the first instance. (Agreement § 3.6(b)).  There is nothing in the Participation Agreement that required Carver to commence a foreclosure action instead of a civil action.  And while, in retrospect, Carver may have been better off immediately foreclosing on the property rather than pursuing Nelkenbaum on his guaranty, hindsight is twenty-twenty.  Given the facts and circumstances known to Carver (and Mariner's Bank) at the time, Carver made a reasonable, albeit flawed, decision to proceed as it did — as the absence of any real objection by Mariner's Bank at the time makes clear. Accordingly, Carver's choice to pursue a civil action in lieu of foreclosure could not have been a breach of the Participation Agreement, and Carver is entitled to summary judgment on this issue.

### c.    Defective and Improper Notice of Default

Third, Purchase Partners alleges that, by issuing a defective and improper notice of default, Carver failed to act "in a reasonably prudent manner" to foreclose on the property. (Compl. ¶ 38 (quoting Agreement § 3.6(b)).  Both Carver and Purchase Partners move for

summary judgment on this issue.  Purchase Partners's principal contention is that collateral estoppel applies to the New York Supreme Court's ruling that Carver's notice to Shaker was defective.  (Pl.'s Mem. Law 37).  It also cites *Moccio v. New York State Office of Court Admin.*, 95 F.3d 195, 197-98 (2d Cir. 1996), *abrogated by Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), for the proposition that "under the *Rooker-Feldman* doctrine, federal district courts, as courts of original jurisdiction, lack the power to entertain claims which, if substantiated, would effectively overrule or modify a state court decision."  (Pl.'s Reply Mem. 7).  By contrast, Carver maintains that the notice it issued was proper, despite the state court's opinion to the contrary.  In any event, it argues that neither collateral estoppel nor the *Rooker-Feldman* doctrine are applicable because the issue of whether Carver mismanaged the loan was never raised in the state court action.  (*See* Def.'s Reply Mem. 17-18).  In other words, it argues that its performance under the Participation Agreement is conceptually distinct from whether its notice of default was defective, the issue upon which the state court ruled.

Purchase Partners's arguments on this issue are without merit.  First, the *Rooker-Feldman* doctrine is expressly confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (quoting *Exxon Mobil*, 544 U.S. at 284).  Thus, to apply the doctrine, (1) "the federal-court plaintiff must have lost in state court"; (2) "the plaintiff must complain of injuries caused by a state-court judgment"; (3) "the plaintiff must invite district court review and rejection of that judgment"; and (4) "the state-court judgment must have been rendered before the district court proceedings commenced."  *Id.* (internal quotation marks and brackets omitted).  Here, none of the first three conditions is satisfied.  The defendant, not the

plaintiff, lost in state court. And Carver is not complaining of injuries caused by the state-court judgment or inviting this Court to review that judgment; instead, it is defending itself against an allegation that it failed to act diligently and promptly. Accordingly, the *Rooker-Feldman* doctrine has no bearing here.

Nor is Carver collaterally estopped from defending itself against Purchase Partners's allegations. The doctrine of collateral estoppel, also known as "issue preclusion," bars a party and its privies "'from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding,' regardless of whether it is in the same cause of action." *In re Indu Craft Inc.*, No. 11 Civ. 5996 (JMF), et al., 2012 WL 3070387, at *10 (S.D.N.Y. July 27, 2012) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002)). But "collateral estoppel is an equitable doctrine — not a matter of absolute right. Its invocation is influenced by considerations of fairness in the individual case." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004). Further, where, as here, a plaintiff seeks to estop a defendant from relitigating an issue it lost against a different plaintiff in a previous action, the Supreme Court has held that district courts have "broad discretion" in deciding whether to apply collateral estoppel. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). Applying that discretion here, the Court would decline to apply collateral estoppel even if the requirements for the doctrine were otherwise met. Carver, after all, chose to file a new foreclosure action instead of challenging the New York Supreme Court's decision on appeal — reasonably calculating that such an approach would bring it, and Purchase Partners, relief more quickly. *See id.* at 330 (noting that it may be unfair to apply collateral estoppel where a defendant had little incentive to vigorously defend the issue in the first action). Moreover, Carver could not necessarily have foreseen that its failure to file an appeal would have preclusive

effect in a subsequent action by Purchase Partners.  *See id.* (holding that applying collateral estoppel against a defendant may be unfair, "particularly if future suits are not foreseeable").

At the same time, there is no basis to grant summary judgment to Carver on this claim either, as a reasonable jury could certainly find, first, that it failed to act in a reasonably prudent manner in issuing the allegedly defective notices and, thus, violated Section 3.6(b) of the Participation Agreement and, second, that the resulting delay in obtaining foreclosure and appointment of a rent receiver caused damage to Purchase Partners.  Whether and to what extent Carver breached its duty of care or the terms of the Participation Agreement are material questions of fact for the jury to decide.  Similarly, whether and to what extent Carver complied with its internal lending policy, and the bearing that has on its performance under the contract, are questions for the jury.  The parties' cross-motions for summary judgment on this issue must therefore be denied.

### d.    Failure to Detect Initial Payment Defaults

Finally, Purchase Partners contends that Carver breached the Participation Agreement by failing in a timely fashion to discover, notify Mariner's Bank about, or act upon Shaker's defaults on the loan.  More specifically, Purchase Partners contends that Carver breached the standard of care set forth in the Agreement by failing to detect or address the first three payments by Shaker, which were either not made or made with checks that bounced.  (Pl.'s Mem. Law 29-36).  In addition, citing the deposition testimony of Charles Koehler, Executive Vice President of Carver in charge of defaulted loans and workouts between September 2006 and March 2008, it contends that there is some evidence that Shaker made no payments *at all* on the loan.  (*See* Pl.'s Supplemental Submission 4).  Carver disputes that Shaker failed to make any payment on the loan, pointing to roughly a dozen checks from All Star Management Group (a Nelkenbaum-

owned entity that managed the property), only three of which were marked void or returned for

insufficient funds.  (*See* Def.'s Supplemental Submission 4).  With respect to the initial

payments, Carver argues that Purchase Partners's claim fails because "Carver had the unilateral

right and authority [under the Participation Agreement] to waive or extend Shaker's performance

with respect to any condition of the Loan."  (Def.'s Opp'n Mem. 8-9).

It is true that Carver had the unilateral right to waive or extend Shaker's time for

performance of any condition of the loan, including payment.  Specifically, Section 3.1 of the

Participation Agreement gave Carver

> the full power and authority, in its sole discretion, as if it were the sole
> party in interest, to take or refrain from taking, any and all actions with
> respect to the administration of the Loan, including, without limitation, the
> right, power, and authority . . . to waive or extend the time for
> performance of any of the conditions and covenants set forth therein . . . .

(Agreement § 3.1).  That authority is besides the point, however, because there is no evidence

that Carver *exercised* it in this case.  That is, waiver and extension of performance are intentional

acts, requiring knowledge.  Here, Carver did not realize that Shaker had defaulted on its initial

payments until November 2008.  It follows that Carver could not, logically, have waived or

extended Shaker's obligation to make those payments a year and a half earlier.

Whether Carver should have detected the initial payment defaults sooner, and whether

Purchase Partners suffered damages as a result, are fact questions for the jury.  So, too, is the

question of whether Shaker made any subsequent payments on the loan.  Although Carver

submitted an affidavit and documentation purporting to establish a number of interim payments

from Shaker, including photocopies of roughly a dozen checks from All Star Management

Group, the testimony of Koehler, a former Carver employee, puts the question of whether Shaker

made any payments into some doubt.  (Pl.'s Supplemental Submission 4).  Given that testimony,

there is some basis for Purchase Partners's argument that Shaker made no payments on the loan and that the checks submitted by Carver were related to one of the other loans made by Carver to a Nelkenbaum-owned entity.  (Pl.'s Supplemental Submission 8; Pincus Aff. Exs. 28, 29).  Although these allegations are admittedly somewhat speculative, they are sufficient — in conjunction with the handling of the initial missed payments — to raise an issue of fact for the jury.  Accordingly, the parties' motions for summary judgment on this issue are both denied.

### B.  Purchase Partners's Claim for Gross Negligence (Count Four)

In Count Four, Purchase Partners alleges that Carver was grossly negligent, and therefore liable in tort, for its mismanagement of the loan to Shaker.  (*See* Pl.'s Opp'n Mem. 46).  To state a claim for gross negligence under New York law, Purchase Partners must establish four elements: (1) the existence of a duty; (2) a breach of that duty; (3) "injury as a result thereof;" and (4) conduct that "evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing," *Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356, 367-68 (S.D.N.Y. 2008) (quoting *AT&T v. City of N.Y.*, 83 F.3d 549, 556 (2d Cir. 1996)).  Significantly, the duty giving rise to a gross negligence claim must be independent of the duty arising from a contract. That is, a party cannot sustain a tort claim if it "does no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached." *Clarendon Nat'l Ins. Co. v. Health Plan Adm'rs*, No. 08 Civ. 6279 (GBD), 2009 WL 3053736, at *3 (S.D.N.Y. Sept. 24, 2009) (citing *Metro. W. Asset Mgmt.,* No. 03 Civ. 5539 (NRB), 2004 WL 1444868, at *9 (S.D.N.Y. June 25, 2004)).

Applying these standards here, Purchase Partners's claim fails because it has not established, or even really alleged, a duty that Carver had independent from its duty arising from the Participation Agreement.  Instead, Purchase Partners puts the onus on the Court to assess

whether a tort obligation is present by considering "the nature of the injury, the manner in which the injury occurred and the resulting harm."  (Pl.'s Opp'n Mem. 47 (quoting *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992)).  These are, indeed, among the "guideposts" that the New York Court of Appeals has identified "for separating tort from contract claims."  *Id.*  So, too, is the existence of a special relationship between the parties, as in the case of professionals, common carriers, and bailees, which "may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.  In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care."  *Id.* (citations omitted).  Here, however, these guideposts point exclusively to a contract claim.

First, the nature of Purchase Partners's injury and the resulting harm caused by the alleged breach of Carver's tort duty are identical to the injury and harm caused by the alleged breach of contract.  Under both causes of action, Purchase Partners alleges loss of rental income, depreciation in the collateral, lost profits, and other consequential damages to be determined at trial.  (*Compare* Compl. ¶ 40, *with id.* ¶ 50).  Similarly, the manner in which the tort injuries allegedly occurred — that is, the grossly negligent behavior of which Purchase Partners complains — is identical to the behavior that grounds Purchase Partners's breach of contract claim.  Indeed, each of the six tort violations identified in Count Four of the Complaint is identical to one of the six breach of contract violations identified in Count Two.  (*Compare id.* ¶¶ 34-39, *with id.* ¶ 49).

Additionally, Purchase Partners has failed to identify a special relationship that, like the relationship between bailor and bailee, would generate an extracontractual obligation on the part of Carver.  In fact, the Second Circuit has held that "[g]enerally, banking relationships are *not* viewed as special relationships giving rise to a heightened duty of care."  *Banque Arabe et*

*Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995) (emphasis

added).  In *Banque Arabe*, the Court explicitly noted that in "loan participation agreements, . . .

there is deemed to be no fiduciary relationship unless expressly and unequivocally created by

contract."  *Id.* (finding that in "the case of arm's length negotiations or transactions between

sophisticated financial institutions, no extra-contractual duty of disclosure exists" (citing *Banco*

*Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 44 (S.D.N.Y. 1991))).  And far

from "expressly and unequivocally" creating a fiduciary relationship, the Participation

Agreement in this case expressly *disclaims* any sort of fiduciary or trust relationship.

(Agreement § 5 ("The Lender neither is, nor shall be, a fiduciary to the Participant, and does not

have a trust relationship to the Participant.")).

Alternatively, Purchase Partners maintains that it should be afforded the opportunity to

establish a duty of care at trial "by virtue of the standard in the banking industry."  (Pl.'s Opp'n

Mem. 47-48).  Even with such an opportunity, however, Purchase Partners could not overcome

the fact that the actions it complains of, and the damages resulting therefrom, are the very same

actions and damages constituting its breach of contract claim.  *See N.Y. Univ. v. Cont'l Ins. Co.*,

662 N.E.2d 763, 770 (N.Y. 1995) (dismissing a tort claim as duplicative of a contract claim); *see*

*also, e.g.*, *Sommer*, 593 N.E.2d at 1369 ("[W]here plaintiff is essentially seeking enforcement of

the bargain, the action should proceed under a contract theory.").  In any event, Purchase

Partners has had ample time to identify the industry standard in question and thereby allege the

proper duty of care.  The mere assertion (in an opposition brief, no less) that such an

extracontractual duty might exist is insufficient to warrant the denial of summary judgment.  *See*

*Sommer*, 79 N.Y.2d at 551 (explaining that "merely alleging that the breach of a contract duty

arose from a lack of due care will not transform a simple breach of contract into a tort").

Based on this analysis, Purchase Partners's gross negligence claim cannot be sustained. *See, e.g.*, *Cohen v. Avanade, Inc.*, No. 11 Civ. 4314 (JMF), 2012 WL 2198087, at *9 (S.D.N.Y. June 15, 2012) (explaining that "to prevail on a negligence claim, [Plaintiff] must demonstrate that Defendants breached a duty independent from their obligations under the contract"); *Clarendon Nat'l Ins. Co.*, 2009 WL 3053736, at *4 (granting a motion to dismiss negligence claims where they arose "from the same alleged conduct that form[ed] the basis for the breach of contract claims," where the damages alleged were duplicative of the breach of contract damages, and where plaintiff failed to cite an independent duty separate from the parties' contractual agreement); *Met. W. Asset Mgmt.,* 2004 WL 1444868, at *9 (dismissing a gross negligence claim because the plaintiff alleged no duty other than that in the indenture); *cf. Anunziatta v. Orkin Exterminating Co.*, 180 F. Supp. 2d 353, 358-59 (N.D.N.Y 2001) (finding that a pest control company had a duty of reasonable care giving rise to an action in tort). Thus, Carver's motion for summary judgment with respect to the gross negligence cause of action (Count Four) is hereby granted.

## C.  Purchase Partners's Claim for Fraud (Count Five)

The fifth claim in Purchase Partners's Complaint is for fraud.  (Compl. ¶¶ 52-60). Specifically, Purchase Partners contends that Carver made material misrepresentations to Mariner's Bank about Shaker, Nelkenbaum, the loan, and Carver's relationship with Shaker and Nelkenbaum, and that these misrepresentations induced Mariner's Bank to enter into the Participation Agreement.  (Compl. ¶¶ 53-55).  In its proposed Amended Complaint, Purchase Partners elaborates on these allegations (in part to satisfy the heightened pleading standards in Rule 9(b) of the Federal Rule of Civil Procedure), identifying three specific categories of alleged misrepresentations and omissions: (1) Carver's alleged failure to advise Mariner's Bank that it

was not competent to service the loan and that it intended to contract with DMI for that purpose;

(2) Carver's alleged misrepresentation to Mariner's Bank that the entities owned by Nelkenbaum

with whom Carver had preexisting loans were living up to their payment obligations; and

(3) Carver's alleged misrepresentation to Mariner's Bank that the purchase price of the property

was $7,600,000.  (Pl.'s Opp'n Mem. 49-50; Proposed Am. Compl. ¶ 66 (Docket No. 83-2)).[7]

To state a claim of fraud under New York law, "a plaintiff must demonstrate: (1) a

misrepresentation or omission of material fact; (2) which the defendant knew to be false;

(3) which the defendant made with the intention of inducing reliance; (4) upon which the

plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Wynn v. AC Rochester*,

273 F.3d 153, 156 (2d Cir. 2001) (per curiam) (citing *Lama Holding Co. v. Smith Barney, Inc.*,

668 N.E.2d 1370, 1373 (N.Y. 1996)); *cf. Eternity Global Master Fund Ltd. v. Morgan Guar.*

*Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (stating the elements of fraud in the

particular context of a claim for fraudulent misrepresentation).  In general, "a fraud claim may

not be used as a means of restating what is, in substance, a claim for breach of contract."  *Wall v.*

*CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (citation and internal quotation marks

omitted).  Thus, to maintain claims for both breach of contract and fraud, a plaintiff must "either

(i) demonstrate a legal duty separate from the duty to perform under the contract; or

(ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or

(iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract

damages."  *Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996)

(citations omitted).

---

[7]     For convenience, the Court addresses the fraud claim in the operative Complaint and the
fraud claim in the proposed Amended Complaint together.

Measured against these standards, Purchase Partners's fraud claim — whether amended or not — fails as a matter of law.  First, as noted above, the Participation Agreement in this case expressly disclaimed any fiduciary or trust relationship between the parties.  (Agreement § 5). Even more significant, by signing the Participation Agreement, Mariner's Bank expressly represented that it had conducted its own independent analysis of the loan, the property, and the lender, and disaffirmed any reliance on Carver.  Section 2.1(c) of the Agreement, for example, states that

> Participant has made, independently, and *without reliance on Lender*, and based on such documents as the Participant shall have deemed appropriate, its own credit analysis and/or investigation into the Premises, the Loan, the Security, and the financial condition, creditworthiness, affairs, status, and nature of the Borrower and has entered into this Agreement in reliance thereon and *not upon any representation made by or on behalf of Lender as to any of the foregoing or any other matter.*

(*Id.* § 2.1(c) (emphases added)).  Similarly, in Section 7.17 of the Participation Agreement, Mariner's Bank "represent[ed] and warrant[ed]" as follows:

> (c) The Participant understands that *the Lender makes no representation or warranty, express or implied*, with respect to the Premises or any part of the facilities or other assets owned by the Borrower or the Security, or the suitability of the Premises for the Borrower's purposes or needs.
>
> . . .
>
> (e) *The Participant has not relied upon the Lender's determination to make the Loan for any purpose*, or on the Lender's evaluation of the Obligor's financial condition, creditworthiness and competency, or on the integrity of the Obligor's management, or of the suitability of the Obligor's business or for any other purpose.

(*Id.* § 7.17) (emphases added).  In light of these provisions, Purchase Partners can neither establish that Carver owed Mariner's Bank a duty independent of the contract or that Mariner's Bank reasonably relied on the alleged misrepresentations and omissions.  *See, e.g.*, *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir. 1980) (explaining that "[d]ecisions holding that

30

reliance on misrepresentations was not justified are generally cases in which plaintiff was placed

on guard or practically faced with the facts"); *Warner Theatre Assocs. P'ship v. Metro. Life Ins.*

*Co.*, 149 F.3d 134, 136 (2d Cir. 1998) (holding that "[a] specific disclaimer [in an agreement]

destroys the allegations in [a] plaintiff's complaint that the agreement was executed in reliance

on . . . contrary . . . representations" (quoting *Danann Realty Corp. v. Harris*, 15 N.E.2d 597,

599 (N.Y. 1959))).

Purchase Partners contends that Carver had a duty to disclose despite these contractual

provisions because it possessed "superior knowledge, not readily available to [Mariner's Bank],

and [knew] that [Mariner's Bank was] acting on mistaken knowledge."  (Pl.'s Opp'n Mem. 61-

62 (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*,731 F.2d 112, 123 (2d Cir.

1984)).  This contention fails, however, when viewed in light of Purchase Partners's particular

allegations of fraud.  Purchase Partners alleges, first, that Carver misrepresented its ability to

service the loan and its intention to outsource servicing of the loan to DMI.  But the Participation

Agreement explicitly provided that Carver retained the right to "sell or delegate servicing rights

to any affiliate or third party deemed appropriate by [Carver]."  (Agreement § 7.15).  Further,

Joseph Dubanowitz, Mariner's Bank's Senior Vice President and Chief Lending Officer, testified

that neither he nor anyone at Mariner's Bank asked Carver if it had the capacity to service the

loan and that, at the time he signed the Participation Agreement, he was aware of the language in

the agreement granting Carver the right to have a third party do so.  (*See* Donohue Decl. 2 Ex.

LL, at 128-30, 132).  In light of these facts, Purchase Partners cannot maintain a fraud claim

based on the servicing of the loan.

Nor is there as basis to maintain a fraud claim based on Purchase Partners's other

allegations — that Carver misrepresented the purchase price of the property and Nelkenbaum's

payment history on the other loans made by Carver.  As noted, the Participation Agreement

expressly provided that Carver made no warranty or representation as "to other assets owned by

the Borrower" (Agreement § 7.17(c)), and that Mariner's Bank did not rely "upon any

representation made by or on behalf of" Carver as to Shaker's (and Nelkenbaum's) "financial

condition, creditworthiness, status . . . or any other matter" (Agreement § 2.1(c)).  In light of

these provisions, Mariner's Bank could have — and plainly should have — asked Nelkenbaum

himself for documentation regarding the purchase price of the property and his loan repayment

history.  Put another way, if the purchase price or Nelkenbaum's payment history on the other

loans had been material to Mariner's Bank decision to participate in the loan to Shaker — as

Purchase Partners alleges now — then it should have investigated them with greater diligence

than it did.  *Cf. Banque Arabe*, 57 F.3d at 158 (holding that the plaintiff did not reasonably rely

on representations of the defendant because it could have discovered the truth through the

exercise of due diligence); *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011,

1016 (2d Cir. 1989) ("Where the representation relates to matters that are not peculiarly within

the other party's knowledge and both parties have available the means of ascertaining the truth,

New York courts have held that the complaining party should have discovered the facts and that

any reliance under such circumstances therefore would be unjustifiable.").

Accordingly, Carver is entitled to summary judgment with respect to Purchase Partners's

fraud claim.  And because the proposed amendment of the fraud claim does nothing to salvage it,

Purchase Partners's motion for leave to amend on that ground is denied.

## D.  Purchase Partners's Motion for Leave to Amend the Complaint

Before turning to address Carver's counterclaims, the Court pauses briefly to address the

last component of Purchase Partners's motion for leave to amend its Complaint — namely, its

request for leave to add claims for negligent misrepresentation and grossly negligent misrepresentation.  (Docket No. 127).  In order to prove either claim under New York law, Purchase Partners would have to establish that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 63 (E.D.N.Y. 2011) (citing *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir. 2000)).  Given the Court's conclusions above, it is plain that Purchase Partners could not establish the first element: the existence of a duty, as a result of a special relationship, to give correct information.  (*See, e.g.*, Agreement §§ 5, 7.17).  It follows that amendment of the Complaint to add claims for negligent or grossly negligent misrepresentation would be futile. *See, e.g.*, *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (stating that, although leave to amend should be "freely given when justice so requires," if "it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave"  (quoting Fed. R. Civ. P. 15(a) and *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam)); *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.").

### E.  Carver's Counterclaims

That brings the Court to Carver's nine counterclaims. The counterclaims can be divided into three general categories:  (1) claims involving Carver's advances to Shaker; (2) claims

involving the transfer of Mariner's Bank's interest in the Participation Agreement to Purchase Partners; and (3) requests for attorneys' fees. With respect to the first category, Carver seeks money damages from Mariner's Bank (Counterclaim 1) or, in the alternative, Purchase Partners (Counterclaim 8) for allegedly breaching the Participation Agreement by failing to reimburse Carver for Mariner's Bank's share of the advances Carver made on behalf of Shaker. With respect to the second category, Carver seeks (1) money damages from Mariner's Bank (Counterclaim 2) for allegedly breaching the Participation Agreement by transferring its interest to Purchase Partners; (2) a declaratory judgment directed toward Mariner's Bank (Counterclaim 3) and Purchase Partners (Counterclaim 6) that the transfer of the Participation Agreement to Purchase Partners is null and void; and (3) an injunction enjoining Mariner's Bank (Counterclaim 4) and Purchase Partners (Counterclaim 7) from transferring their interests in the Participation Agreement. In the third category of counterclaims, Carver requests reasonable attorneys' fees and costs from both Mariner's Bank (Counterclaim 5) and Purchase Partners (Counterclaim 9). The Court will address each category of counterclaims in turn.

### a. Failure to Contribute to the Advances

Carver's first and eighth counterclaims relate to Mariner's Bank's and Purchase Partners's failure to reimburse Carver for fifty percent of the advances it made to Shaker. (Answer ¶¶ 76-97, 133-39). In Counterclaim One, Carver seeks damages from Mariner's Bank. In Counterclaim Eight, it seeks a declaratory judgment that Purchase Partners is required to pay its share of the advances in the event it is determined that Mariner's Bank's sale, transfer, or conveyance of its interest in the Participation Agreement to Purchase Partners is valid. Both parties move for summary judgment on these counterclaims.

Significantly, there is no dispute that Mariner's Bank (or Purchase Partners), as the

Participant, was obligated to pay half of the advances.  That is for good reason, as Section 3.8(a)

of the Participation Agreement states in relevant part as follows:

> The Lender may, in its commercially reasonable discretion, make [advances for
> various reasons]. . . .  Upon the making of any such advance . . . (an "Advance")
> by the Lender, then each Participant shall pay to the Lender an amount equal to
> the sum of: A) the amount of such Advance multiplied by [its share of the loan],
> plus B) interest . . . unless such payment is received within five business days of
> written demand, in which event, interest will not be due.

(Agreement § 3.8(a)).  As Purchase Partners concedes, this provision "creates a contractual

obligation on the part of the Participant to pay its share of any advances made by the Lender."

(Pl.'s Mem. Law 22).  And although Purchase Partners raises some questions about the amount

that Carver claims it advanced (*see e.g.*, Transcript 33:11-34:4), there is no dispute that Carver

advanced at least $500,000.  (*Id.* 33:13-15).

Instead, the parties' dispute stems from the remainder of Section 3.8(a), which provides

as follows:

> If any Participant fails to pay . . . its Share of any such advance, then such
> Participant's Share shall be correspondingly reduced  (and the Shares of the
> Lender paying its respective share of such Advance correspondingly increased) on
> a proportionate basis.  Thereupon, the Lender will issue an additional
> Participation Certificate reflecting the amount of the additional Advance.  If
> Lender does not receive repayment from Participant of Participant's Share of any
> Advance . . . , the Lender shall receive interest on each Advance, accruing from
> the date such Advance was made until each Participant pays, to the Lender: 1)
> such Participant's respective Share of such Advance, together with 2) interest on
> such Share of such Advance.

(Agreement § 3.8(a)).  Emphasizing the first part of this language, Purchase Partners contends

that Carver's sole remedy for Mariner's Bank's failure to pay its share of the advances is "to

reduce the participant's share on a proportionate basis" — and that, because the Agreement

provides this as a self-executing remedy, the failure to pay is not a breach, let alone a material

breach.  (Pl.'s Mem. Law 23).  Not surprisingly, Carver stresses the latter part of the language quoted above, and asserts that it also had the option of suing Mariner's Bank (and now Purchase Partners) for its share of the advances plus interest.  (Def.'s Opp'n Mem. 23-24).

The Court is not in a position to choose between these competing interpretations of the contractual language, which confusingly states that two different results "shall" follow from the Participant's failure to pay its share of the advances.  In fact, as the Court posited at oral argument, there is even a third plausible interpretation of the relevant language, according to which, upon non-payment by the Participant, the Lender readjusts the Participant's share in the loan *and* interest begins to accrue until such time as the advances are repaid.[8]  In light of the inherent ambiguity in the governing provision of the Participation Agreement, both parties' motions for summary judgment on this issue must be denied.  *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning.").  *But see Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir. 1994) (explaining that a court can grant summary judgment on an ambiguous contract if there is no extrinsic evidence).

### b.   Transfer of Mariner's Bank's Interest to Purchase Partners

Next, Carver moves for summary judgment on its second, third, fourth, sixth, and seventh counterclaims, which allege that Mariner's Bank breached the Participation Agreement by transferring its interest to Purchase Partners without Carver's consent.  (Answer ¶¶ 98-111, 123-

---

[8]      This interpretation is not without its own problems, however.  If, for example, the Participant ultimately repaid its share of the advances plus interest, thereby making the Lender whole for the initial non-payment, the Participant would arguably be entitled to the portion of proceeds from the loan that it did not get during the time its proportionate share was reduced.

36

132).  Carver seeks money damages from both Mariner's Bank and Purchase Partners, and it urges the Court to declare the transfer null and void.  (*Id.* ¶¶ 98-109, 123-29).  In addition, Carver seeks to enjoin Mariner's Bank and Purchase Partners from transferring their interests in the future.  (*Id.* ¶¶ 110-111, 130-32).

On its face, the Participation Agreement certainly barred Mariner's Bank from transferring its interest in the loan to Purchase Partners without Carver's consent.  It states that "neither the Participant nor its legal representatives nor its successors in interest by operation of law or otherwise may assign or transfer all or any part of its Interest *without the prior written consent of the Lender*."  (Agreement § 7.15 (emphasis added)).  Purchase Partners admits, as it must, that Mariner's Bank transferred its interest in the loan.  (*See* Pl.'s Opp'n Mem. 18).  And it implicitly admits that it failed to obtain Carver's consent as Section 7.15 contemplated.  (*See id.* (noting that Mariner's Bank gave Carver notice of its intent to sell its participation interest, but not alleging that it obtained written consent)).  Nevertheless, it argues that Carver is not entitled to summary judgment on the counterclaims relating to this transfer because there are issues of fact as to whether Mariner's Bank was relieved of its contractual obligations due to Carver's material breaches of the Participation Agreement.  (Pl.'s Opp'n Mem. 65).  Putting aside the fact that whether Carver breached the Participation Agreement is a question for trial, this argument is without merit.

Under New York's doctrine of election of remedies, if a party to an agreement believes that the agreement has been breached, it "must choose between terminating the contract and continuing performance.  If [the] party chooses to continue performance, it must give notice of breach to the other side, or it waives its rights to sue the breaching party."  *Hallinan v. Republic Bank & Trust Co.*, 519 F. Supp. 2d 340, 351 (S.D.N.Y. 2007) (quoting *RBFC One, LLC v. Zeeks,*

*Inc.*, 367 F. Supp. 2d 604, 611 (S.D.N.Y. 2005), *aff'd*, 171 F. App'x 902 (2d Cir. 2006)).  If

timely notice is given, the non-breaching party retains its right to sue for the alleged breach, but

"by choosing not to terminate the contract at the time of the breach, the nonbreaching party

'surrenders [its] right to terminate later based on that breach.'"  *Albany Med. Coll. v. Lobel*, 745

N.Y.S.2d 250, 252 (App. Div. 3d Dep't 2002) (quoting *AM Cosmetics Inc. v Solomon*, 67

F. Supp. 2d 312, 317 (S.D.N.Y. 1999)).

Here, there is no allegation or indication that Mariner's Bank terminated the Participation

Agreement upon Carver's alleged breach or breaches.  In fact, as late as November 18, 2009,

more than a month and a half *after* Mariner's Bank and Purchase Partners entered into the loan

purchase agreement, Mariner's Bank sought Carver's consent to sell its participation interest in

the loan, which had already occurred, subject only to an option to put the participation interest

back to Mariner's Bank should Carver not grant its consent.  (*See* Donohue Decl. 2 Ex. II).

Simply put, there would have been no reason for Mariner's Bank to seek Carver's consent if it

did not consider itself bound by the contract as of that date.

The chief, if not only, piece of evidence Purchase Partners proffers to establish that

Mariner's Bank gave notice of breach or notice of termination is an undated letter in which

Mariner's Bank stated that it was not prepared to pay its share of the advances "without a full

accounting."  (Pincus Aff. Ex. 38).  But that letter actually cuts against Purchase Partners's

argument, as it plainly contemplated that the contractual relationship between Mariner's Bank

and Carver was ongoing.  For example, Mariner's Bank requested confirmation that the advances

were "capitalized, not expensed," and that Carver would issue the appropriate certificate of

participation "if/when" it reimbursed Carver.  (*Id.*).  Even more significant, Mariner's Bank

requested notification of any future advances "as called for by the . . . Participation Agreement"

so that it could "administer this loan in a more efficient manner on [its] end, which should

benefit Carver as well as Mariner's [Bank]."  (*Id.*).  In short, even if Carver did breach the

Participation Agreement — an issue that requires trial — Mariner's Bank was not entitled to

breach Section 7.15 of the Agreement itself because it elected to continue performing under,

rather than terminate, the contract.

      The remedy for Mariner's Bank's clear breach, however, is not — as Carver urges — to

"declare that the transfer is null, void and unenforceable, that Purchase Partners has no interest in

the Participation Agreement and [to] restore Mariner's [Bank] as the participant."  (Def.'s

Supplemental Submission at 2).  That is because, "[w]ith limited exception, contractual

provisions prohibiting assignments are treated as personal covenants.  An assignment made in

violation of a personal covenant prohibiting assignments is enforceable, although it does give

rise to a damages action against the assignor."  *Pro Cardiaco Pronto Socorro Cardiologica S.A.

v. Trussell*, 863 F. Supp. 135, 137 (S.D.N.Y. 1994) (citing *Citibank, N.A. v. Tele/Resources, Inc.*,

724 F.2d 266, 268 (2d Cir. 1983)).  The limited exception is when the relevant provision of the

contract contains "clear, definite, and appropriate" language declaring an assignment invalid.

*Sullivan v. Int'l Fid. Ins. Co.*, 465 N.Y.S.2d 235, 237 (App. Div. 2d Dep't 1983).  In other words,

"assignments are enforceable unless expressly made void, and not . . . void unless specified

otherwise."  *Trussel*, 863 F. Supp. at 138 (citing *Belge v. Aetna Cas. & Sur. Co.*, 334 N.Y.S.2d

185, 187 (App. Div. 4th Dep't 1972)).

      Here, Section 7.15 of the Participation Agreement plainly prohibited transfers and

assignments without the written consent of Carver, but it does not state — let alone in "clear,

definite, and appropriate" language, *Sullivan*, 465 N.Y.S.2d at 234 — that any such transfer or

assignment would be invalid or void.  The transfer is therefore valid, and Carver's remedy for

Mariner's Bank's breach, if any, is an award of damages. *See Trussel*, 863 F. Supp. at 137-38 (collecting cases). Accordingly, Carver's motion for summary judgment on its second counterclaim — seeking money damages for breach of the non-transfer provision of the Participation Agreement — is granted as to liability. On the record before the Court, it is not clear whether Carver suffered any damages as a result of the transfer, but Purchase Partners did not seek dismissal of Carver's second counterclaim on that basis so the Court leaves the issue of damages resulting from the transfer, if any, for trial.

Given the Court's ruling, there is no legal basis for Carver's third, fourth, sixth, and seventh counterclaims — seeking declaratory judgments that the transfer is null and void, and injunctive relief barring future transfers. Carver's motion for summary judgment on these counterclaims is therefore denied and the counterclaims are dismissed. *See, e.g.*, *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 114-15 (2d Cir. 1999) ("Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." (quoting *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996) (noting that "a district court's independent raising and granting of summary judgment in favor of the nonmoving party is an accepted method of expediting litigation (internal quotation marks and citation omitted))).

### c. Attorneys' Fees

Finally, Carver moves for summary judgment on its fifth and ninth counterclaims for attorneys' fees. (Def.'s Mem. Law 24-25). (Although Purchase Partners also seeks attorneys' fees (Complaint ¶¶ 61-63), it does not move for summary judgment on that claim.) Section 7.9

of the Participation Agreement states, in relevant part, that if an action is brought to enforce the agreement, "the prevailing party . . . shall be entitled to recover its costs and expenses, including, without limitation, reasonable attorneys [sic] fees."  (Agreement § 7.9).  In light of the Court's rulings (most notably, its denial of summary judgment on the bulk of Purchase Partners's contract claim), however, it is premature to declare either party "the prevailing party" within the meaning of this provision.  Accordingly, Carver's motion for summary judgment on its claim for attorneys' fees is denied.

## CONCLUSION

The net result of the foregoing rulings is that, of the six counts alleged in the Complaint, only Counts Two (Breach of Contract) and Six (Attorneys' Fees) survive.  Carver's motion for summary judgment with respect to Count One (Specific Performance), Count Three (Breach of the Implied Covenant of Good Faith and Fair Dealing), Count Four (Gross Negligence), and Count Five (Fraud) is GRANTED, and those counts are hereby DISMISSED.

The surviving claim, Count Two (Breach of Contract), is limited in that Carver's motion for summary judgment is GRANTED as to the breaches Purchase Partners claims were caused by Carver's alleged failure to obtain consent before pursuing a civil action and its decision to pursue a civil action in the first instance.  Carver's motion on Count Two is otherwise DENIED, as is the entirety of Purchase Partners's summary judgment motion on Count Two.

As to the counterclaims, the parties' cross-motions for summary judgment are DENIED with respect to Carver's first and eighth counterclaims (Contribution to Advances), and Carver's motion is DENIED with respect to its fifth and ninth counterclaims (Attorneys' Fees).  The Court GRANTS Carver summary judgment, however, as to liability on its second counterclaim (Breach of Contract Due to Transfer), but in so doing it DISMISSES Carver's third, fourth, sixth, and

seventh counterclaims (Declarative and Injunctive Relief Regarding the Transfer).  The Court GRANTS Purchase Partners's motion for summary judgment in favor of Paul Schmidt on all counterclaims asserted against him; those counterclaims are hereby DISMISSED.

Finally, Purchase Partners's March 21, 2012, motion for leave to amend the complaint is DENIED as moot, and its September 7, 2012, superseding motion to amend the complaint is GRANTED IN PART and DENIED IN PART.  No later than January 11, 2013, Purchase Partners may amend its Complaint to add allegations regarding Carver's handling of the so-called initial payment defaults, but it does not have leave to amend for any other reason, such as adding claims for negligent misrepresentation or gross negligent representation or revising its fraud claim.

The Clerk of Court is ordered to dismiss Schmidt as a party and to close the motions addressed in this Order (Docket Nos. 63,76, 80, 83, 84, 127).


SO ORDERED.


Dated: December 13, 2012
       New York, New York

_____
  JESSE M. FURMAN
  United States District Judge